IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA      )
                              )
     v.                       )          1:11CR32-1
                              )
DWIGHT LEANDER SOLOMON        )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

Before the court are the Motion to Suppress (Doc. 13) and Motion to Compel Disclosure of Identity of Confidential Informant (Doc. 20) filed by Defendant Dwight Leander Solomon ("Solomon"). The parties have briefed the motions, and two evidentiary hearings were held: one on April 26, 2011, to address the above motions; and one on April 29, 2011, pursuant to Franks v. Delaware, 438 U.S. 154 (1978). For the reasons set forth below, the motion to suppress is granted in part and denied in part, and the motion to compel the disclosure of the informant's identity is denied.

I.   **BACKGROUND**

At the April 26, 2011, hearing, the Government offered the testimony of the following witnesses: Agent Gary Ray Bullard, a 21-year veteran of the Sanford (North Carolina) Police Department ("Sanford PD"), where he has served as a narcotics investigator for 15 years; Lieutenant Bryan Allen of the

narcotics division of the Lee County (North Carolina) Sheriff's Office, where he has been employed since 1999; Sergeant Charles Brian Estes, of the narcotics division of the Lee County Sheriff's Office, where he has been employed since 2002; and Agent Raymond Leroy Allen, II, currently a narcotics agent with the Sanford PD, where he has been employed for 13 years. The court finds the testimony of each of these officers to be credible and finds the following facts.

**A.    Search of 418 and 414 Maple Avenue**

On August 17, 2006, Agent Bullard, having received information that Defendant Solomon was selling cocaine out of a residence at 418 Maple Avenue in Sanford, North Carolina, contacted one of his confidential informants ("CI"), an individual he had used more than ten times, to arrange a controlled purchase of drugs from the residence. Because the information indicated that Solomon was keeping his drugs hidden outside the residence, Agent Bullard also placed some officers in the wood line around the residence for observation.

Agent Bullard met with the CI, thoroughly searched the informant and the informant's vehicle, provided $150 in U.S. currency (whose serial numbers were recorded) with which to purchase the cocaine, and instructed the CI to go to 418 Maple Avenue to attempt to purchase cocaine from Solomon. The informant was specifically instructed not to use a cellular

phone or to deviate from a direct route to and from the residence to make the purchase. At about 9:15 p.m., the agent then followed the CI to 418 Maple Avenue and parked just down the street, never losing sight of the CI's vehicle.

Officers stationed nearby observed the CI arrive at the residence and radioed Agent Bullard when the CI departed. Agent Bullard followed the CI's vehicle and met the CI at a predetermined location. The CI's complete round trip lasted approximately 15 minutes. Agent Bullard again thoroughly searched the CI in the same manner as before, finding none of the cash he had provided but receiving from the CI a quantity of a substance that the CI reported was purchased from Solomon. Agent Bullard examined the substance, which field-tested positive for cocaine, and packaged it for safekeeping. The CI reported that Solomon had gone out the back door of his residence to get the cocaine.

Based on this information, Agent Bullard prepared an affidavit and applied that evening to a magistrate in the General Court of Justice for Lee County, North Carolina, for a warrant to search 418 Maple Avenue. The affidavit provided in part:

> Your affiant is a sworn law enforcement officer and has been so employed with the Sanford Police Department for the past Sixteen years. Currently your affiant is assigned to the City-County Drug Unit, a tri-agency task force made up of officers from the

3

Sanford Police Department, Lee County Sheriff's Department, and the Lee County ABC Law Enforcement Division. Your affiant has attended numerous classes and training in the field of narcotics enforcement including the Basic Narcotics Investigators Course administered by the Drug Enforcement Administration and the Basic Narcotics Investigators Course administered by the North Carolina Justice Academy.

Your affiant was contacted by a confidential source of information within the past (48) forty-eight hours about the above location. This confidential source of information, under your affiant's supervision, went to the above location and made a controlled purchase of a substance that field tested positive for Cocaine.

This confidential source of information was searched prior to going to the above location for controlled substances and U.S. Currency and none were located. This confidential source of information was given U.S. Currency from the City-County Drug Unit's Special Funds; serial numbers recorded. Surveillance was maintained on this confidential source of information from the pre-determined meeting location to the above location and back to the pre-determined meeting location. The confidential source of information did not go to any other location other than the above location. This confidential source of information was then searched again and no other controlled substance or U.S. Currency was located.

Your affiant prays for the courts authority to search the above premises and seize any items of contraband located to be held subject to court ordered disposition.

(Gov't Ex. 1.) The application specifically noted that the contraband to be seized was "Cocaine." (Id.) The magistrate issued the warrant at 9:58 p.m. that evening.

Agent Bullard then traveled to 418 Maple Avenue to execute the search warrant. As he and other officers arrived at the residence, Solomon was standing on or near his back porch.

Agent Raymond Allen, who had known Solomon for several years and was stationed near a creek behind the residence, approached Solomon and detained him with handcuffs for protective reasons while the drug unit conducted its search of the residence. Solomon was patted down for weapons, led to the front of the residence, and turned over to other agents. Agent Allen did not formally arrest Solomon because he did not know at the time whether the controlled purchase would be the basis for any criminal charges.[1]

Participating in the search of the residence, Agent Bullard looked in all places he believed cocaine could be hidden, including closets, drawers, and furniture. The following items were seized: one set of pocket digital scales; one set of digital scales with white powder residue; a 2" x 4" piece of paper with "3.0 gram M" written on it found on top of the kitchen cabinets; a box of Winchester .45 caliber ammunition located in the top of the closet of bedroom number one; a box of Winchester .38 Special ammunition found on a shelf in the kitchen closet; a box of 9 mm ammunition found in the kitchen pantry; one white garbage bag with a red drawstring found on the living room floor; several clear plastic baggie corners found in a jacket in the bedroom closet; a utility invoice for 418 Maple

---

[1] Solomon argues that he was arrested upon his initial detention. This contention is addressed in note 7 _infra_.

Avenue for July 14 through August 14, 2006, addressed to Solomon; a Cingular cellular phone invoice addressed to Solomon at 418 Maple Avenue for July 7 through August 6, 2006; and a Cingular wireless rebate coupon for a Motorola Razor telephone for Dwight Solomon found on the television in bedroom number one. The ammunition, plastic garbage bag with red drawstring, digital scales, and paper noting "3.0 gram M" were all visible in plain view in the residence, as further documented by photographs introduced during the evidentiary hearing. (Gov't Exs. 2-4, 6-7.) Agent Bullard was aware at the time he executed the search warrant that Solomon was a convicted felon and thus not permitted to possess ammunition under federal law.

At some point following the search, Solomon was formally arrested. Officers discovered approximately $2,300 in his pockets. Of that amount, four $20 bills and two $10 bills matched the currency given to the CI to conduct the controlled purchase.

Agent Allen and his partner, Officer Rick Kendall of the Sanford PD, had been surveilling 418 Maple Avenue starting at about 9:00 p.m. that evening and had observed Solomon walk to the rear area of a vacant house next door at 414 Maple Avenue. Based on this observation, the information received by Agent Bullard that Solomon kept his drugs outside his residence, the report by the CI that Solomon had gone outside his residence to

6

retrieve the cocaine, and the results of the search of 418 Maple Avenue, all of which supported the belief that Solomon's movements were related to his suspected drug activity, officers searched the area outside of 414 Maple Avenue. They discovered a backpack underneath the steps in the same area where Solomon had been seen. Inside the backpack was suspected cocaine, a white garbage bag containing two white plastic bags of suspected marijuana, and a charger for a cellular phone. Officers then obtained a search warrant for 414 Maple Avenue (Doc. 14, Ex. 2) and executed it.

The next day, August 18, 2006, Agent Bullard contacted the registered owner of 418 Maple Avenue, who informed him that the residence was rented to Solomon. The owner also indicated that he had sold 414 Maple Avenue to Gary Jones, who, when Agent Bullard contacted him, indicated that it remained vacant and was not rented to anyone.

**B.    Search of 54 Springfield Drive**

On March 10, 2010, during daylight hours, Lieutenant Bryan Allen was on routine patrol in Sanford, North Carolina, in an unmarked Ford Explorer. With him were Agent Charles Dew and Sergeant Estes of the Lee County Sheriff's Office. As they drove past the residence at 54 Springfield Drive, they noticed vehicles, including a white van, parked in the yard. Lieutenant Allen drove down the street to turn around, and when he and his

partners returned they observed an individual whom Sergeant Estes recognized – based on his personal interactions with him - as Defendant Solomon standing by the van talking with three men inside the van. Lieutenant Allen knew that Solomon lived at that residence based on prior contact with him, including a prior arrest of Solomon for driving while his license was revoked, at which time Solomon gave 54 Springfield Drive as his address, as well as prior domestic-violence-related incidents involving Solomon and his wife.

Lieutenant Allen backed his vehicle into a nearby driveway from where he could conduct surveillance. The white van drove past his vehicle, and Lieutenant Allen observed its driver attempting to put on his shoulder restraint. A traffic stop was initiated (for driving without a seat belt). The white van did not pull over at first, and Lieutenant Allen noticed "quite a bit of movement" inside it which appeared "odd and suspicious" to him.

As Lieutenant Allen called in the tag on the van, Agent Dew and Sergeant Estes went outside to talk with the driver, who identified himself as Wayne McKendall. In the front passenger seat was Alvin Davis, and Fredrick McKendall sat in the back seat. Fredrick McKendall appeared to be "very, very nervous," according to Sergeant Estes, to the point that his chest was "coming in and out when he was breathing." After checking the

driver's license, Lieutenant Allen asked whether anyone possessed any contraband in the van and whether they would consent to its search. They denied having any contraband and consented to a search. The officers searched the van but found no contraband.

Outside the van, Agent Dew noticed a bag containing scales and batteries on the ground near where the three van occupants were standing. All three men denied ownership of these items, and Lieutenant Allen told them they were free to leave, thanking them for their cooperation. As the men headed back to the van, however, Lieutenant Allen and Agent Estes noticed that Fredrick McKendall appeared to be apprehensive about moving and took "a real awkward step" with a stiff leg. Suddenly, a bag containing a hard off-white colored substance fell to the ground from inside Fredrick McKendall's pant leg. Based on his training and experience, Lieutenant Allen believed the substance to be crack cocaine.

Lieutenant Allen approached Fredrick McKendall and, taking him aside separately, asked him if he wanted to talk, noting that he would be charged but that it might help his case if he cooperated. Fredrick McKendall told Lieutenant Allen that he had obtained the cocaine from the counter inside Solomon's residence after Solomon had placed it there. At the evidentiary hearing, Lieutenant Allen confirmed that he was "absolutely

positive" that Fredrick McKendall said he had obtained the cocaine from Solomon's residence.[2]  Although Sergeant Estes was not within earshot of this conversation, he could see Lieutenant Allen speaking with Fredrick McKendall, who appeared to cooperate.  During the encounter, no firearms were drawn, and no loud voices were used.

Lieutenant Allen then applied for a search warrant for 54 Springfield Drive.  In support of the warrant, he swore out an affidavit which stated in pertinent part:

> The following investigation involves probable cause to believe that illegal controlled substances are located inside of the residence of 54 Springfield drive Sanford NC, 27332.
>
> On Wednesday March 10, 2010 agents Bryan Allen, Brian Estes and Charles Dew of the Lee County Sheriff's Office Narcotics Division were doing surveillance on the residence located at 54 Springfield Drive, Sanford NC 27330 that agents know to be the primary residence of Dwight Leander Solomon.  Agents observed a white in color Dodge minivan sitting stationary in the yard of 54 Springfield Drive unoccupied as agents drove by. Lieutenant Bryan Allen passed the residence located at 54 Springfield Drive and turned around to find a good location to sit without being seen.  Lieutenant Allen pulled his vehicle up just enough to see the front of the residence located at 54 Springfield Drive Sanford NC 27332.  Agents observed that the Dodge minivan was occupied by three unidentified males.  Agents observed Dwight Leander Solomon standing with his arms on top of the van and speaking with the occupants. Lieutenant Allen drove up to the next residence and parked in the driveway waiting on the white Dodge minivan to leave the residence located at 54 Springfield Drive Sanford NC, 27332.  Agents observed

---

[2]   As discussed in Parts I.C and II.D.2 _infra_, Solomon attacks this statement by Lieutenant Allen as a false one under <u>Franks v. Delaware</u>.

the white Dodge minivan drive by.  Agents noticed the
driver identity unknown was not wearing his seat belt.
Lieutenant Allen pulled out and followed the white
Dodge minivan, once out of the neighborhood Lieutenant
Allen initiated a traffic stop by use of blue lights
and siren.  The white Dodge minivan did not stop right
away.  Agents observed movement from all occupants of
the white Dodge minivan bearing North Carolina
registration plate number VTP-9736.  After the vehicle
stopped Agents made contact with the driver Wayne
Jerome McKendall and Alvin Junius Davis and Fredrick
McKendall the two occupants.  Agents observed that the
3 individuals inside of the white Dodge minivan
appeared to be nervous.  Agent Estes notified
Lieutenant Allen that Fredrick McKendall appeared to
be breathing very rapidly, Lieutenant Allen agreed.
Lieutenant Allen asked for consent to search the
vehicle based upon the suspicious movement observed
earlier and the nervousness of the occupants.  The
driver and occupants gave consent.  Will [sic] in the
process of searching the vehicle Agents located a
quantity of cocaine and a set of digital scales
covered with cocaine residue.  Fredrick McKendall
advised Lieutenant Allen that he (McKendall) had
gotten the crack cocaine from Dwight Solomon inside of
Solomon's residence.

In addition to the aforementioned information, Agents
from the Lee County Sheriff's Office have received
information that Dwight Leander Solomon uses the
residence and the property of 54 Springfield Drive
Sanford, NC 27332 to store controlled substances along
with US currency from the sales of illegal controlled
substances.

It shall be noted that Agents observed the white Dodge
minivan in the driveway of 54 Springfield Drive
Sanford, NC 27332.  Agent [sic] observed an individual
known to agents as Dwight Leander Solomon speaking
with the individuals inside of the white Dodge
minivan.  Agents are familiar with Dwight Leander
Solomon and know that 54 Springfield Drive Sanford, NC
27332 is the primary residence of Dwight Leander
Solomon.  Dwight Leander Solomon is currently under
investigation for his involvement in trafficking
controlled substances.  Your affiant believes that
more controlled substances are located inside the

residence of 54 Springfield Drive Sanford, NC 27332
along with US currency from the sales of illegal
controlled substances.

Your affiant believes that the aforementioned
information provides probable cause to believe that
controlled substances are located on the property of
54 Springfield Drive Sanford, NC 27332. Your affiant
prays unto the court that a search warrant be issued
for the residence described in this application.

(Gov't Ex. 8.) A magistrate in the General Court of Justice for
Lee County, North Carolina, issued the search warrant at 5:15
p.m. that afternoon. The warrant authorized, among other
things, the seizure of "[c]ocaine, items of drug paraphernalia,
items of identification and residency, [and] U.S. [c]urrency
from the sales of illegal controlled substances." (Id.)

Officers returned to the residence and executed the search
warrant. Solomon was not present at the time. Eleven items
were seized, including the following: two orange hydraulic jacks
and their components, which Lieutenant Allen recognized as being
of the type used in the illegal drug trade to compress cocaine
for packaging; a receipt, bill of sale, and security bill; a
pill bottle containing oxycodone; two cellular phones; a camera
and film; a plastic container with a white powder residue; and
several documents.

A hydraulic jack component and the plastic container, both
of which featured a white powder residue, were sent to the North

Carolina State Bureau of Investigation for analysis, which confirmed that the residue was cocaine.

### C. **Franks** Hearing

After the evidentiary hearing, Solomon moved for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). (Doc. 24.) Solomon submitted a sworn declaration from Fredrick McKendall stating that he did not obtain any drugs from Solomon on March 10, 2010, that he had purchased the cocaine found on him from someone on the street earlier in the day, and that he never told Lieutenant Allen he had obtained the cocaine from Solomon but rather told the lieutenant he had bought it from someone else at an earlier time. (Doc. 24, Ex. 2.) Solomon also submitted sworn declarations from Wayne McKendall (Doc. 24, Ex. 3) and Alvin Davis (Doc. 24, Ex. 4), both of whom stated that no drug transaction took place between Fredrick McKendall and Solomon on March 10, 2010. However, both also stated that they did not hear the conversation between Fredrick McKendall and Lieutenant Allen. Solomon argued that this constituted an offer of proof that Lieutenant Allen's statement in the warrant affidavit for 54 Springfield Drive about the information he received from Fredrick McKendall was untrue and that Lieutenant Allen must have made this false statement either intentionally or with reckless disregard for the truth. Solomon provided an accompanying statement of reasons and contended that without

13

Lieutenant Allen's allegedly untrue statement, the warrant lacked probable cause.

After reviewing Solomon's motion and the Government's response, the court found that Solomon, through Fredrick McKendall's sworn denial that he made the statement attributed to him, had made "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement [was] necessary to the finding of probable cause." Franks, 438 U.S. at 155-56. The court therefore ordered a Franks hearing to be held on April 29, 2011, at which Solomon had the opportunity to demonstrate by a preponderance of the evidence that his allegation of an intentional or reckless false statement in the warrant affidavit was correct.

At the Franks hearing, Solomon offered the testimony of his three declarants. In his testimony, Fredrick McKendall did not challenge the Government's account of what occurred on March 10, 2010, except that he testified that he never told Lieutenant Allen he got the cocaine found on him from Solomon. On cross-examination, he said that the cocaine, approximately 14.9 grams, cost $50 and that he bought it earlier that day "off the streets in the neighborhood." When pressed, he said he could not remember who he bought it from and admitted he has been using

crack cocaine "a pretty good while." He was unable to account at all for his whereabouts either the day before or the day after his stop. Normally, he said, he would keep his crack cocaine in his pockets and not in his pants leg where the cocaine was when he was stopped in this case.

Wayne McKendall testified that he is Fredrick McKendall's first cousin, that he had driven Solomon home just before they were spotted by law enforcement on March 10, 2010, and that Alvin Davis and Fredrick McKendall had followed in another car. Wayne McKendall said he was at Solomon's residence about five minutes after the other two arrived and never saw Fredrick McKendall obtain any cocaine from Solomon, even though his cousin was in his presence the whole time. As to the traffic stop, when asked if he could hear what was being said, Wayne McKendall said that he could when all three of the van occupants were outside the van but that he could not when the officers took Fredrick McKendall aside and placed him in a car. At this point, Fredrick McKendall was "out of [his] earshot." However, when asked if he "ever hear[d] [Fredrick McKendall] say that he got the drugs from Mr. Dwight Solomon," Wayne McKendall answered: "No, I didn't. In fact, I heard him say he didn't get the drugs from [Dwight Solomon's house]." This last statement directly contradicts Wayne McKendall's declaration, in which he stated under oath: "The officers discovered some

cocaine on Fredrick but I did not hear anything Fredrick said to the officers." (Doc. 24, Ex. 3.)

Alvin Davis testified that he was at Solomon's house with the others, that Fredrick McKendall was in his sight the whole time, and that he never saw Fredrick McKendall obtain any cocaine from Solomon. Alvin Davis also said that law enforcement separated Fredrick McKendall from the other van occupants after the cocaine was found during the stop of the van and that he (Alvin Davis) was unable to hear anything Fredrick McKendall said to the officers.

The Government presented the testimony of Angela Richmond, who has served as a compensated confidential informant on several occasions for the Lee County Sheriff's Office. She has known Solomon for 15 years and Fredrick McKendall for 25-30 years. During an attempted controlled purchase from Solomon at his car wash business on March 18, 2010, she observed Fredrick McKendall who appeared to have been beaten badly in the face. He told her that Solomon had done it based on a belief that Fredrick McKendall had fingered Solomon during an earlier stop by officers — apparently the March 10, 2010, traffic stop.

The Government also recalled Lieutenant Bryan Allen, who said the information in the affidavit for the search warrant for 54 Springfield Drive was true and accurate to the best of his knowledge. He denied any attempt to mislead the magistrate and

testified that he has never been accused of submitting or found to have submitted any false information in any court proceeding. He reiterated that Fredrick McKendall told him he got the drugs from Solomon. This conversation occurred when Lieutenant Allen and Frederick McKendall were on the roadside and Wayne McKendall and Alvin Davis were back in the van. Given that he was "a good distance away" and using a low voice to keep the conversation confidential, Lieutenant Allen did not believe the other van occupants could have heard his conversation with Fredrick McKendall.

The court finds that Solomon's contentions are not credible. Solomon pins his hopes on Fredrick McKendall's credibility, after having first argued to this court that he was too unreliable to be believed (see Doc. 14 at 10). Fredrick McKendall indeed suffers from significant credibility problems. He is a self-professed crack cocaine user who cannot recall anything about his whereabouts during the relevant time period or about the source of the cocaine except the convenient fact that it was not Solomon. Having been beaten for allegedly implicating Solomon, it is not surprising that Fredrick McKendall would not want to do so now. Wayne McKendall, who swore in his declaration that he did not hear *anything* Fredrick McKendall told the officers, now volunteers that he heard him say he did not get his cocaine from Solomon. In addition, both

of the McKendall cousins willingly swore to declarations that they were "brothers," when they are not (but are cousins). Both are either indiscriminate testifiers, or worse. Alvin Davis did not overhear the conversation between Lieutenant Allen and Fredrick McKendall, and his testimony does not undermine what Lieutenant Allen says he heard. Indeed, the question is not whether Fredrick McKendall in fact obtained his drugs from Solomon, but only whether he told Lieutenant Allen that he did.

On this record, the court finds that Lieutenant Allen heard Fredrick McKendall say on March 10, 2010, that he got his cocaine from Solomon.

### D. **Present Criminal Charges**

Solomon was initially charged federally in an indictment filed on February 1, 2011. (Doc. 1.) On February 28, 2011, a superseding indictment was filed, charging him with possession of, with intent to distribute, 46.8 grams of cocaine base ("crack") in violation of 21 U.S.C. § 841(a)(1) (Count I); possession of ammunition (approximately 39 rounds of Winchester .45 caliber ammunition, approximately 30 rounds of Winchester .38 caliber ammunition, and approximately 50 rounds of CCI Blazer 9 mm ammunition) by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count II); and distribution of 14.9 grams of cocaine base ("crack") in violation of 21 U.S.C. § 841(a)(1) (Count III). (Doc. 9.)

Solomon now challenges the validity of the search warrants for 418 and 414 Maple Avenue and 54 Springfield Drive on several grounds. He also moves to suppress the fruits of those searches as well as the cash found on his person on August 17, 2006. Solomon contends further that the CI was so centrally involved in the August 17, 2006, events resulting in his criminal charges that the CI's identity (and other information about the CI) must be disclosed.

The Government responds that Solomon has demonstrated no reasonable expectation of privacy in the premises at 414 Maple Avenue and therefore may not challenge the search of that location or any resulting seizures. The Government also argues that the search warrants for 418 Maple Avenue and 54 Springfield Drive were supported by probable cause, that the seizures from those locations were proper, and that the seizure of the cash found on Solomon's person was proper. Finally, the Government argues that the CI's role was limited to conducting the controlled purchase of cocaine that served as the basis for the search warrant for 418 Maple Avenue and that his or her identity therefore need not be revealed.

Each of Solomon's arguments will be examined in turn in light of the court's factual findings from both hearings.

## II.  ANALYSIS

### A.  Search of 414 Maple Avenue

Solomon argues that the fruits of the search of 414 Maple Avenue should be suppressed because the affidavit supporting the search warrant failed to establish probable cause. The Government responds that Solomon had no legitimate expectation of privacy in that location, so he cannot challenge the search warrant or the search.

"[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.*, one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Minnesota v. Carter, 525 U.S. 83, 88 (1998) (internal quotation marks omitted); see also, e.g., United States v. Gray, 491 F.3d 138, 154 (4th Cir. 2007) (holding that where the defendant's purpose in the residence searched was "patently commercial" (involving drug trafficking), the defendant had no legitimate expectation of privacy in that residence); id. at 146 ("Someone who hides illegal activity in a vacant field or abandoned warehouse . . . takes his or her chances that law enforcement officials will happen upon incriminating evidence."). "The burden of showing a reasonable

expectation of privacy in the area searched rests with the defendant." <u>Gray</u>, 491 F.3d at 144.

Here, Solomon has not established any connection between himself and 414 Maple Avenue. To the contrary, at the evidentiary hearing counsel for Solomon conceded that he does not assert any facts demonstrating an expectation of privacy in that location. Moreover, Agent Bullard testified that he spoke by telephone with the owner of 414 Maple Avenue, who advised him that the residence was vacant at the time of the search and was not rented to anyone.

The court finds that Solomon has not met his burden of demonstrating that he possessed a reasonable expectation of privacy in 414 Maple Avenue at the time of the search, so he cannot challenge the search of that location or any seizures that took place there. His motion to suppress as to any evidence seized during the search, therefore, is denied.

**B.   Search of 418 Maple Avenue**

Solomon argues that the evidence seized from 418 Maple Avenue should be suppressed because (1) the search warrant for that address was not supported by probable cause and (2) the warrant only authorized the seizure of "Cocaine," but the evidence seized consisted of ammunition, documents, and miscellaneous drug paraphernalia. The Government responds that the controlled purchase carried out at 418 Maple Avenue and

described in the warrant affidavit established probable cause and that seizure of most of the items was justified under the plain view doctrine.  These arguments will be examined in turn.

### 1.  Validity of the Search Warrant

The Fourth Amendment requires that search warrants be supported by probable cause.  U.S. Const. amend. IV.  Courts apply a "totality of the circumstances" analysis to determine whether probable cause exists to support a search warrant. Illinois v. Gates, 462 U.S. 213, 238 (1983).  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Id.  A reviewing court need only determine "whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."  Massachusetts v. Upton, 466 U.S. 727, 728 (1984) (per curiam).  In reviewing a probable cause determination, the court may consider only "the information presented to the magistrate who issued the warrant," United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996), and the court "must accord great deference to the magistrate's assessment of the facts presented to him."  United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990) (internal quotation marks omitted).

Here, the warrant affidavit sworn to by Agent Bullard stated that officers were contacted by a CI about 418 Maple Avenue within the forty-eight hours prior to the warrant application, and that officers then carried out a controlled purchase of a substance from 418 Maple Avenue that field-tested positive for cocaine. The controlled purchase was described in great detail in the affidavit: the CI was searched for controlled substances and U.S. currency and none was found; the CI was given U.S. currency from the drug unit's special funds; the serial numbers of the currency were recorded; surveillance was maintained on the CI from a predetermined meeting location to 418 Maple Avenue and back; the CI did not go to any location other than 418 Maple Avenue; and afterward the CI was searched again and no other controlled substance or U.S. currency was located.

Under nearly identical circumstances, the Fourth Circuit held that probable cause existed in <u>United States v. Clyburn</u>, 24 F.3d 613 (4th Cir. 1994). In <u>Clyburn</u>, a confidential informant (who was in jail at the time and thus potentially unreliable) contacted police and advised them that the defendant was selling drugs. <u>Id.</u> at 614. The informant then made a controlled purchase of crack cocaine from the defendant at his residence. <u>Id.</u> at 615. The Fourth Circuit held that probable cause existed to support the issuance of a search warrant for the defendant's

residence, stating that "[t]hese facts plainly established a 'fair probability' that illegal narcotics would be found in [the defendant's] house . . . and accordingly supported the magistrate's finding of probable cause." Id. at 618 (citation omitted); accord United States v. Casanova, 168 F.3d 483 (4th Cir. 1999) (per curiam) (unpublished table decision) ("Ordinarily, an informant's controlled buy may constitute probable cause sufficient for a magistrate judge to issue a warrant." (citing Clyburn)).[3]

Solomon's principal argument against the existence of probable cause is that the affidavit did not provide information about the reliability of the CI: for example, whether the CI had ever before worked for law enforcement. Where a warrant is based in part upon information from a confidential informant, two factors are key to the court's "totality-of-the-circumstances" analysis: the informant's "veracity" or "reliability" and his or her "basis of knowledge." Wilhelm, 80 F.3d at 119. However, the Fourth Circuit held in Clyburn that a controlled purchase could establish an informant's reliability.[4]

---

[3]  Unpublished decisions are not precedential but are cited for their persuasive authority based on similar facts.

[4]  The controlled purchase in Clyburn was described as follows: "[L]aw enforcement officers search the informant to make sure that she does not have any illegal narcotics before the purchase; officers provide the informant with marked bills with which to purchase the drugs; officers place a body wire on the informant and monitor all conversations during the purchase; the informant is placed under

See 24 F.3d at 618 ("Although the informant's reliability initially was questionable due to her incarceration, [the officer who submitted the warrant application] verified the informant's allegations by setting up and monitoring controlled purchases of cocaine."); see also, e.g., United States v. Allen, 960 F.2d 1055, 1057 (D.C. Cir. 1992) (per curiam) ("We have . . . upheld . . . a search warrant based on a reliable informant's tip about drug activity at a residence corroborated by a single controlled buy . . . ."). Moreover, the warrant for 418 Maple Avenue was based not only upon information from the CI but also upon law enforcement officers' own observations of the controlled purchase procedure, including the CI's trip to 418 Maple Avenue with U.S. currency and the CI's return from the residence without the currency but with cocaine.

Solomon's other arguments against the existence of probable cause are not persuasive. Solomon contends that the affidavit did not mention prior drug transactions at 418 Maple Avenue, did not state that Solomon lived at 418 Maple Avenue or sold drugs there, and did not state that the controlled purchase took place inside the residence (as opposed to in the front yard).

---

visual surveillance during the purchase; and the informant turns over the contraband to the officers immediately after the purchase." 24 F.3d at 615 n.1. Each of these steps was taken in Solomon's case, according to the affidavit, except for the use of the body wire. In Casanova, an unpublished table decision, the Fourth Circuit held that the absence of the body wire and the lack of visual surveillance during each moment of the buy did not destroy probable cause. See 168 F.3d 483.

However, multiple drug transactions are not necessary to establish probable cause. See, e.g., Clyburn, 24 F.3d at 617-18 (holding that a warrant based upon an informant's tip and a single controlled purchase was supported by probable cause). Nor must the identity of a seller or his precise connection to the residence be established. The affidavit clearly stated that the CI "went to the above location [i.e., 418 Maple Avenue] and made a controlled purchase of a substance that field tested positive for Cocaine." (Gov't Ex. 1.) Any possibility that the controlled purchase took place just in front of the house did not destroy probable cause, and further specification of where at 418 Maple Avenue the purchase took place was not required.

Solomon's final argument against probable cause is that the affidavit did not state that the officers observed the sale. Such an explicit statement is not required. Here, the affidavit provided that "[s]urveillance was maintained on [the CI] from the pre-determined meeting location to the above location and back to the pre-determined meeting location." (Id.) A common-sense reading of this, under the "totality of the circumstances," supported a reasonable belief that the CI obtained cocaine from the residence.

For all the above reasons, the court finds there is substantial evidence in the record that was before the

magistrate supporting the decision to issue the warrant to search 418 Maple Avenue for cocaine.

Even if probable cause could be said to be lacking, United States v. Leon, 468 U.S. 897 (1984), established a good faith exception to the exclusionary rule.  "Leon teaches that a court should not suppress the fruits of a search conducted under the authority of a warrant, even a subsequently invalidated warrant, unless a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." United States v. Andrews, 577 F.3d 231, 236 (4th Cir. 2009) (internal quotation marks omitted), cert. denied, 130 S. Ct. 1031 (2009).  "[E]vidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was objectively reasonable."  Id. (internal quotation marks omitted).

There are four situations in which an officer's reliance on a search warrant would not be "objectively reasonable": (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "the issuing magistrate wholly abandoned his judicial role as a detached and neutral decisionmaker"; (3) "the officer's affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable"; and (4) "a warrant [is] so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." Id. (internal quotation marks omitted). Solomon argues that the third and fourth situations were present here and rendered the good faith exception inapplicable.

"[T]he *Leon* good-faith exception does not apply in the case of a bare bones affidavit." Wilhelm, 80 F.3d at 122. A "bare bones" affidavit is "one that contains wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." United States v. DeQuasie, 373 F.3d 509, 521 (4th Cir. 2004) (internal quotation marks omitted). The standard required for the good faith exception to apply is less demanding than the "substantial basis" threshold required to establish probable cause in the first place. United States v. Bynum, 293 F.3d 192, 195 (4th Cir. 2002).

The court finds that the affidavit in this case, which contained extensive details about the applying officer's credentials and the procedures used by law enforcement during the controlled purchase at 418 Maple Avenue, was not a "bare bones" affidavit. The affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Therefore, the third exception to the Leon good faith exception did not apply.

Solomon's final challenge is that the search warrant was facially deficient and failed to satisfy the Fourth Amendment's requirement that it "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A warrant meets the "particularity" requirement "if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended," United States v. Owens, 848 F.2d 462, 463 (4th Cir. 1988), and the things to be seized, see United States v. Hurwitz, 459 F.3d 463, 470 (4th Cir. 2006). Here, the warrant clearly identified the premises to be searched ("418 Maple Avenue, Sanford Nc [sic]"), the property to be seized ("Cocaine"), and the suspected crime ("Possession of Cocaine").[5] (Gov't Ex. 1.) The court holds that the search warrant satisfied the "particularity" requirement and was not facially deficient.

Therefore, the court holds that the search warrant for 418 Maple Avenue was supported by probable cause and, in the alternative, fell within the good faith exception of Leon.

---

[5] Also, the attached affidavit stated: "Your affiant prays for the courts [sic] authority to search the above premises and seize any items of contraband located to be held subject to court ordered disposition." (Gov't Ex. 1.) "An affidavit may provide the necessary particularity for a warrant if it is either incorporated into or attached to the warrant." United States v. Washington, 852 F.2d 803, 805 (4th Cir. 1988).

Solomon points out that although the warrant only authorized the seizure of cocaine, the items seized from 418 Maple Avenue included ammunition, documents, and miscellaneous drug paraphernalia. This contention does not challenge the validity of the warrant, but attacks the basis for the warrantless seizures of ammunition, documents, and other items from the residence. This is a separate matter to which the court will now turn.

### 2. Warrantless Seizures Within 418 Maple Avenue

Solomon argues that because the search warrant only authorized the seizure of cocaine, any other items seized during the search of 418 Maple Avenue must be suppressed. The Government responds that the plain view doctrine rendered the seizure of many of the items permissible.

"[T]he plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." United States v. Jackson, 131 F.3d 1105, 1109 (4th Cir. 1997). "The government bears the burden of establishing that the circumstances of a warrantless search or seizure bring it within an exception to the warrant requirement." United States v. Davis, 657 F. Supp. 2d 630, 636 (D. Md. 2009) (citing

Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971) (plurality opinion)).

Here, the presence of Agent Bullard and the other officers in 418 Maple Avenue was lawful, because of the search warrant. Agent Bullard testified that the three boxes of ammunition were found inside closets (two in the kitchen and one in a bedroom) that he accessed in order to search for cocaine pursuant to the search warrant. He also testified that the boxes were in plain view inside these closets, and this is supported by photographs introduced during the evidentiary hearing. (Gov't Exs. 2-4.) Agent Bullard stated that he was aware at the time of the search that Solomon was a convicted felon and thus not permitted to possess ammunition under federal law. Because of this, the ammunition's "incriminating character" was "immediately apparent" to Agent Bullard. Therefore, the court holds that as to the ammunition the requirements of the plain view doctrine were satisfied and the seizure was permissible. Cf., e.g., United States v. Hanton, 189 F. App'x 247, 251-52 (4th Cir. 2006) (unpublished per curiam opinion) (holding that the plain view doctrine permitted the seizure of firearms from the home of a known convicted felon, where the search warrant only authorized the seizure of documentary evidence of money laundering).

Turning to the other items seized, Agent Bullard testified that the digital scales and the 2″ by 4″ piece of paper reading "3.0 gram M" were found in plain view on a kitchen cabinet. The location of the paper, at least, is corroborated by a photograph introduced during the hearing. (Gov't Ex. 6.) Agent Bullard also testified that the white garbage bag with red drawstring was found in plain view on the living room floor, and this is corroborated by a photograph introduced during the hearing. (Gov't Ex. 7.) According to the inventory of seized property (Gov't Ex. 1), the clear plastic baggie corners were found in a jacket in a bedroom closet during the search for cocaine.

The court holds that the plain view doctrine applied to each of these items. The officers were lawfully inside 418 Maple Avenue to search for cocaine pursuant to the search warrant, and Agent Bullard testified that they searched in all places where cocaine might be hidden, including closets, drawers, and furniture. Each of the items listed above was found in a place where cocaine might be located and thus where the officers lawfully had access, that is, on a kitchen cabinet, on the living room floor, and in a jacket in a bedroom closet. The "incriminating character" of each item was also "immediately apparent." Scales of this type are commonly found in connection with illegal drug activity, and one of the scales contained a white powder residue, while the piece of paper was found with

the scales and contained a message that appeared to be linked to drug activity. Cf. Jackson, 131 F.3d at 1109 (holding that if a deputy was lawfully in the area in which he observed ziplock bags, gel caps, white powder, a strainer, scales, and Isotol, the plain view doctrine would authorize seizure of this drug paraphernalia, which the deputy immediately recognized as such); United States v. Crouch, 648 F.2d 932, 933 (4th Cir. 1981) (per curiam) (holding that where a warrant authorized seizure of "chemicals, laboratory equipment, and other paraphernalia" used in the maufacture of methamphetamines, the plain view doctrine permitted seizure of letters written between the suspects and containing information on the manufacture of methamphetamine). The white garbage bag with red drawstring matched exactly a bag containing drugs found inside the backpack from 414 Maple Avenue, and as for the clear plastic baggie corners, "[b]aggies and baggie corners are well-known tools of the narcotics distribution trade." United States v. Fisher, 912 F.2d 728, 731 (4th Cir. 1990).

The remaining items seized are the two invoices and the rebate coupon. There was no testimony that these documents were found in plain view, and the Government has not explained how the plain view doctrine applies to them. The Government conceded at the hearing the difficulty in justifying their seizure. Therefore, the court will grant Solomon's motion to

suppress as to these three documents. As to all other items seized from 418 Maple Avenue, the motion is denied.

###    C.    **Arrest and Search of Solomon**

Solomon challenges his arrest on the night of August 17, 2006, and the associated search of his person, which led to the seizure of $100 in currency matching that given to the CI to conduct the controlled purchase. Solomon contends that this currency must be suppressed because the search warrant did not authorize his arrest and there was no probable cause to support a warrantless arrest. The Government argues that Solomon was not formally arrested but was detained during the search of the residence, during which time a frisk was permissible, and that ultimately probable cause was established by the discovery of ammunition and scales containing a white powder residue in 418 Maple Avenue and drugs next door. The Government argues that Solomon's subsequent formal arrest was proper and the search of him incident to his arrest was valid.

"Under the Fourth Amendment, a warrantless arrest is an unreasonable seizure unless there is probable cause to believe that a criminal offense has been or is being committed." United States v. Johnson, 599 F.3d 339, 346 (4th Cir. 2010), cert. denied, 131 S. Ct. 358 (2010). "The standard for whether probable cause exists is an objective one; it exists when, at the time the arrest occurs, the facts and circumstances within

the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." Id. (internal quotation marks omitted).

However, even in the absence of probable cause to arrest, "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 692, 705 (1981). In Summers, the defendant was detained outside his house by police officers executing a warrant to search the house for narcotics. Id. at 693. The officers required the defendant to reenter the house and remain there during the search. Id. The officers found narcotics in the basement and then arrested the defendant on the ground that the narcotics established probable cause. See id. During a search of the defendant incident to his arrest, the officers found heroin in the defendant's pocket. Id. The trial court granted the defendant's motion to suppress this heroin, id. at 694, but the Supreme Court reversed the suppression, holding that "[i]f the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home." Id. at 704-05; see id. at 705 ("Because it

was lawful to require [the defendant] to re-enter and to remain in the house until evidence establishing probable cause to arrest him was found, his arrest and the search incident thereto were constitutionally permissible.").

In this case, a parallel sequence of events occurred. When law enforcement officers began to execute the search warrant for 418 Maple Avenue, Agent Raymond Allen, who had been observing Solomon behind the house and who had known Solomon for several years, approached Solomon, who was standing on or near his back porch, and detained him for the duration of the search. Agent Allen testified that he did not place Solomon under arrest at that time based upon the earlier controlled purchase of narcotics, because he did not know whether Solomon would be charged for the controlled purchase. Instead, Agent Allen took Solomon to the front of the residence and turned him over to other agents while the search of the residence continued. These actions were all constitutionally permissible under Summers.[6] See id. at 704-05.

---

[6]  While "[a]n officer's authority to detain incident to a search is categorical," the officer may use only "reasonable force to effectuate the detention." Muehler v. Mena, 544 U.S. 93, 98-99 (2005).  Thus, the use of handcuffs to detain Solomon must have been constitutionally reasonable, a determination that is made by balancing the governmental interests at stake with the intrusion upon Solomon's Fourth Amendment interests.  See Graham v. Connor, 490 U.S. 386, 396 (1989) ("Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests

Agent Allen testified that he did not conduct a full search of Solomon or seize anything from his person. However, he conducted a <u>Terry</u> frisk of Solomon, that is, "[a] frisk for weapons [which] is permissible when an officer reasonably believes that the person being stopped 'may be armed and presently dangerous.'" <u>United States v. Hernandez-Mendez</u>, 626 F.3d 203, 211 (4th Cir. 2010) (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968)), <u>cert. denied</u>, 79 U.S.L.W. 3568 (2011). During this frisk, Agent Allen could tell that there was money in Solomon's pockets and saw that the pockets were bulging. However, there is no evidence that Agent Allen removed the money from Solomon's pockets, examined it, or seized it. Thus, the cash ultimately seized from Solomon was not a fruit of the <u>Terry</u> frisk, which the court therefore need not examine further.

Solomon was eventually arrested after the officers found incriminating evidence, that is, the boxes of ammunition and the scales inside 418 Maple Avenue and the drugs behind 414 Maple

---

at stake." (internal quotation marks omitted)); <u>cf., e.g.</u>, <u>Muehler</u>, 544 U.S. at 99-100 (holding that the use of handcuffs to detain multiple detainees during a 2- to 3-hour search of a gang house for dangerous weapons was constitutionally reasonable "because the governmental interests outweigh the marginal intrusion"). However, the court need not resolve this question, because the use of handcuffs to detain Solomon had no connection to the discovery of the incriminating cash and did not lead to the seizure of that cash. Therefore, this determination is not relevant to Solomon's motion to suppress. <u>See</u> <u>United States v. Najjar</u>, 300 F.3d 466, 477 (4th Cir. 2002) ("[A] direct, unbroken chain of causation [from a Fourth Amendment violation] is necessary . . . to render derivative evidence inadmissable.")

Avenue.  The Government argues that probable cause existed at this point to support a warrantless arrest, and the court agrees.  Probable cause exists when "at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense."  Johnson, 599 F.3d at 346.  Here, it was known that Solomon was a convicted felon and thus not permitted to possess ammunition under federal law.  As a result, the finding of three boxes of ammunition inside Solomon's residence clearly warranted the belief that Solomon had committed or was committing a federal offense, namely, possession of ammunition by a convicted felon.  The finding of the scales containing a white powder residue provided further support for this belief.  Therefore, the arrest was lawful.

Once Solomon was properly arrested, the officers were permitted to search his person.  See United States v. Murphy, 552 F.3d 405, 410 (4th Cir. 2009) ("One of the well-recognized exceptions to the warrant requirement is a search incident to a lawful arrest. . . . Pursuant to this exception, law enforcement officers following a lawful arrest may search the arrestee's person and the area within his immediate control." (citation omitted) (internal quotation marks omitted)).  The discovery and

seizure of the incriminating cash in Solomon's pockets was

therefore lawful.[7]

---

[7]    Solomon argues that his initial detention constituted or was
"tantamount" to an arrest that either has to be justified based on the
controlled purchase (thus potentially requiring identification of the
CI) or, if not, was made without any probable cause.  He bases this
argument on language in two police reports submitted by Solomon to the
court after the evidentiary hearing that state in conclusory fashion
that Solomon was arrested and searched (even though one report is by
Agent Raymond Allen, who was available for cross-examination on this
point at the hearing).  The court has already concluded that it was
lawful for Solomon to be detained pending the search of the residence.
Thus, even if Solomon had been arrested prematurely during execution
of the search warrant, suppression of the cash would not be required
because he would not have been permitted to leave the premises anyway
and ultimately probable cause to arrest him developed independently
once the ammunition was found, which permitted the search of
his person incident thereto.  See Najjar, 300 F.3d at 477 ("[A] direct,
unbroken chain of causation [from a Fourth Amendment violation] is
necessary . . . to render derivative evidence inadmissable."); cf.,
e.g., United States v. Glover, 9 F. App'x 167, 170-72 (4th Cir. 2001)
(unpublished per curiam opinion) (holding that suppression was not
required based upon a potentially illegal impoundment of defendant's
vehicle, where police gained no information from the premature
seizure, probable cause to search the vehicle developed independently
within a few hours, police obtained a search warrant for the vehicle
based upon this independent probable cause, and police then discovered
incriminating evidence in the vehicle pursuant to the warrant).
        To the extent Solomon contends that he was also searched
prematurely — that is, before probable cause was established by the
fruits of the search of 418 Maple Avenue — suppression still would not
be required.  The cash would be admissible under the "inevitable
discovery" rule, because if the officers had proceeded lawfully (as
the court finds they did), the cash would inevitably have been
discovered through a lawful search incident to arrest after probable
cause was established. See United States v. Allen, 159 F.3d 832, 838
(4th Cir. 1998) ("[I]nformation obtained by unlawful means is
nonetheless admissible '[i]f the prosecution can establish by a
preponderance of the evidence that the information ultimately or
inevitably would have been discovered by lawful means.'" (second
alteration in original) (emphasis omitted) (quoting Nix v. Williams,
467 U.S. 431, 444 (1984))); id. at 841 ("The doctrine . . . may apply
where the facts indicate another search inevitably would have occurred
and would inevitably have uncovered the evidence, and that search
falls within an exception to the warrant requirement [such as a search
incident to arrest]."); cf. United States v. Jones, 72 F.3d 1324,
1329-34 (7th Cir. 1995) (admitting evidence from an allegedly
premature search of the defendant's person under the "inevitable

Having considered all arguments by the parties and examined each action taken by the law enforcement officers on August 17, 2006, the court finds no constitutional violation requiring suppression of the cash found on Solomon's person. Solomon's motion to suppress is thus denied as to this evidence.

### D.   Search of 54 Springfield Drive

Solomon challenges the validity of the search warrant for 54 Springfield Drive, arguing that (1) on its face, the warrant affidavit did not establish probable cause and (2) the warrant contained a "false statement [made] knowingly and intentionally, or with reckless disregard for the truth," Franks, 438 U.S. at 155, without which probable cause could not have existed. The Government contends that the warrant affidavit established probable cause and that it contained no false statement. The court will examine these arguments in turn.[8]

### 1.   Facial Validity of the Search Warrant

The warrant affidavit sworn to by Lieutenant Bryan Allen described surveillance of Solomon's residence at 54 Springfield Drive by Lieutenant Allen, Agent Dew, and Sergeant Estes. Solomon was then under investigation for his involvement in

---

discovery" doctrine, where officers were executing a search warrant for the defendant's residence and would ultimately have had probable cause to arrest and search the defendant by the time they departed the premises).

[8]  Solomon does not argue that this warrant failed the "particularity" requirement.

trafficking controlled substances, and the officers knew that 54 Springfield Drive was Solomon's primary residence.  According to the affidavit, the officers saw an unoccupied white van in front of the house.  By the time the officers had turned around and repositioned themselves, the van was occupied by three men, and Solomon was standing outside the van talking to the occupants. After the van left Solomon's residence, the officers stopped it (for a seat belt violation) and asked for consent to search the vehicle based upon the occupants' suspicious movement and visible nervousness.  While in the process of searching the vehicle, the officers located cocaine and digital scales containing cocaine residue.[9]  The affidavit provided that Fredrick McKendall, one of the three van occupants, stated that he had received the crack cocaine from Solomon inside Solomon's residence.

Giving the required "great deference" to the magistrate's assessment of the facts, Blackwood, 913 F.2d at 142, the court need only determine "whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant," Upton, 466 U.S. at 728.  The magistrate was required to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . .

---

[9]  As apparent in the affidavit language quoted earlier, the affidavit did not explain exactly where these items were found.

there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238.

Solomon's only argument for the absence of probable cause is that the affidavit did not establish reliability on the part of Fredrick McKendall. Solomon contends that Fredrick McKendall "certainly would have a motive to try to distance himself from culpability if he could." (Doc. 14 at 10.)

However, the court notes that this warrant does not involve a confidential or anonymous informant. "[C]ourts have had no difficulty distinguishing between cases involving face-to-face encounters with informants and cases involving anonymous tipsters. Unlike an anonymous tipster, an informant who meets face-to-face with an officer provides the officer with an opportunity to assess his credibility and demeanor and also exposes himself to accountability for making a false statement." United States v. Blauvelt, No. 09-4601, 2011 WL 810111, at *5 (4th Cir. Mar. 9, 2011) (alterations in original) (quoting United States v. Perez, 393 F.3d 457, 462 (4th Cir. 2004)). The Fourth Circuit has also stated, in the context of determining whether probable cause existed to support a warrantless arrest, that an informant's "interest in obtaining leniency [as to charges against her] created a strong motive to supply accurate information." United States v. Miller, 925 F.2d 695, 699 (4th

Cir. 1991); see id. ("The informant hoped that by giving reliable information she would receive a lenient sentence. If she provided false information she had nothing to gain and could have risked an additional charge for falsification."). Solomon's contention that Fredrick McKendall had an incentive to provide false information about Solomon to protect himself from culpability stands in stark contrast to this holding. Suffice it to say that given the close proximity of the stop to Solomon's house, it was certainly not apparent to the officers that Fredrick McKendall would have been lying.

Moreover, the affidavit contained information supporting the statement by Fredrick McKendall. The officers had observed the three van occupants, including Fredrick McKendall, at 54 Springfield Drive interacting with Solomon. Also, when the officers first saw the van, it was unoccupied, rendering plausible an inference that the occupants were inside the residence. This is consistent with the statement by Fredrick McKendall that he obtained the cocaine from within Solomon's residence. Furthermore, the officers recognized Solomon, knew that 54 Springfield Drive was Solomon's primary residence, and knew that he was then under investigation for his involvement in trafficking controlled substances.

The court finds that substantial evidence was before the magistrate to support the decision, based on the "totality of

the circumstances," to issue a warrant to search 54 Springfield Drive for evidence of illegal drug activity.

Even if probable cause could be said to be lacking, the court finds that the good faith exception established in Leon would apply, unless the warrant affidavit contained an intentionally or recklessly false statement, as Solomon argues in his next contention. Solomon has not argued that any of the other three exceptions to Leon apply, and the court finds that they do not. There is no evidence that "the issuing magistrate wholly abandoned his judicial role as a detached and neutral decisionmaker" or that the warrant was "so facially deficient . . . that the executing officers [could not] reasonably presume it to be valid." Andrews, 577 F.3d at 236 (internal quotation marks omitted). Nor was the warrant affidavit, which was over two pages long and contained a detailed description of the affiant's credentials and the events of March 10, 2010, a "bare bones" affidavit that was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id.

Therefore, the court holds that, unless there was an intentionally or recklessly false statement in the warrant affidavit, the warrant was supported by probable cause and, in the alternative, fell within the good faith exception established in Leon.

## 2. Solomon's <u>Franks</u> Argument

At the <u>Franks</u> hearing, Solomon had the burden of demonstrating, by a preponderance of the evidence, that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." <u>Franks</u>, 438 U.S. at 155-56. Specifically, Solomon had to establish that Lieutenant Allen intentionally or recklessly made a false statement in the warrant affidavit when he declared that Fredrick McKendall had told him he obtained the cocaine from Solomon inside Solomon's residence.

As discussed previously, after considering all the evidence, including the credibility of Fredrick McKendall, the court has found that Lieutenant Allen heard Fredrick McKendall say that he got the cocaine from Solomon. In light of this finding, Solomon has failed to satisfy his burden of establishing, by a preponderance of the evidence, an intentionally or recklessly false statement in the warrant affidavit. <u>Cf.</u> <u>United States v. Clenney</u>, 631 F.3d 658, 663-64 (4th Cir. 2011) (holding that the defendant failed to meet his burden under <u>Franks</u> where the statements in the affidavit challenged by the defendant were found not to be false). Solomon's motion to suppress the fruits of the search warrant for 54 Springfield Drive is therefore denied.

**E.   Motion to Compel Disclosure**

Solomon moves to compel the Government to disclose the name and address of the CI who participated in the controlled purchase at 418 Maple Avenue, as well as other information about the CI.  Solomon contends that the CI was an essential player in the events leading to the current charges and that any evidence concerning the controlled purchase would be "tantamount to hearsay" unless the CI's identity is disclosed and Solomon has the opportunity to question him or her.  The Government responds that the CI's identity need not be disclosed because the CI was only used to obtain a search warrant.

The decision whether to require disclosure of a confidential informant lies generally within the discretion of the district court.  <u>United States v. Blevins</u>, 960 F.2d 1252, 1260 (4th Cir. 1992).  Solomon bears the burden of proving that he is entitled to know the identity of a confidential informant. <u>Id.</u> at 1258.

The Government generally enjoys a privilege under certain circumstances to withhold the name of a confidential informant. <u>United States v. Gray</u>, 47 F.3d 1359, 1364-65 (4th Cir. 1995). The purpose of this privilege "is the furtherance and protection of the public interest in effective law enforcement," and the privilege "recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement

officials and, by preserving their anonymity, encourages them to perform that obligation." Roviaro v. United States, 353 U.S. 53, 59 (1957).

The privilege is lost, however, "when the informant's identity is relevant and helpful to the defense or is essential to fundamental requirements of fairness." Gray, 47 F.3d at 1364. Under Roviaro, the court must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." 353 U.S. at 62. The Fourth Circuit has emphasized that "the key to reviewing a district court's failure to compel disclosure is a balancing of the competing interests in light of the particular circumstances of the case." Gray, 47 F.3d at 1365 (internal quotation marks omitted). "[A]n important factor affecting disclosure is the informant's involvement in the criminal acts of the accused." Id. Under this approach, the Government is generally privileged to withhold the identity of an informant when he or she was a "mere tipster" or was used only for obtaining a search warrant. Id. In contrast, failing to disclose the informant's identity more likely constitutes error if the informant was an "active participant in the events leading to the arrest of the accused." Id.

Here, Solomon's motion is controlled by "the well settled principle that the government is permitted to withhold the

identity of a confidential informant when the informant was used only for the limited purpose of obtaining a search warrant." Id. (internal quotation marks omitted); accord United States v. Poms, 484 F.2d 919, 922 (4th Cir. 1973) (per curiam). Making an individualized assessment based on the facts of this record, the court finds that the CI's only role in the events leading to the present charges against Solomon was to execute a controlled purchase at 418 Maple Avenue, which led to a search warrant for that address. While searching that location, law enforcement officers found the ammunition that forms the basis for one of the charges against Solomon. Evidence of illegal drug activity found during the search and during the subsequent searches of 414 Maple Avenue and Solomon's person led to another charge for possession of the crack cocaine found at 414 Maple Avenue. Solomon has not been charged in connection with the controlled purchase itself. Thus, the CI had no connection to any of the criminal acts with which Solomon has actually been charged. Moreover, as noted in Part II.C supra, the arrest of Solomon and the subsequent search of his person were not based upon the controlled purchase.

Ultimately, the court must balance "the public interest in protecting the flow of information" against Solomon's "right to prepare his defense." Roviaro, 353 U.S. at 62. Solomon has provided no clear reasons why the name and address of the CI

would be "relevant and helpful to [his] defense" against the pending charges or "essential to fundamental requirements of fairness." Gray, 47 F.3d at 1364. Solomon's argument focuses on the possibility that during trial the Government will introduce evidence of the controlled purchase, in particular the cash found on Solomon's person, to support one of the 21 U.S.C. § 841(a)(1) charges. Solomon objects to the introduction of such evidence unless the CI's identity is disclosed so he or she may be questioned about the purchase. However, such evidence would not be based upon the credibility of the CI or upon any statements made by the CI. Rather, law enforcement officers would testify to their own observations of the controlled purchase and to the evidence they later located on Solomon's person.[10] The identity or testimony of the CI, therefore, does not appear to be necessary to Solomon's defense, and he has not advanced any theory of how the testimony might assist him. Instead, his request appears to be based upon mere speculation that testimony from the CI could shed additional light on the controlled purchase that ultimately might prove relevant. Cf. United States v. Smith, 780 F.2d 1102, 1108 (4th Cir. 1985) (en banc) ("The defendant must come forward with something more than speculation as to the usefulness of such disclosure. . . .

---

[10] At the evidentiary hearing, counsel for the Government stated that the Government would not offer into evidence any information reported by the CI, conceding that such evidence would be hearsay.

Disclosure is not required despite the fact that a criminal defendant may have no other means of determining what relevant information the informant possesses. . . . Disclosure is only required after a court has determined that the informer's testimony is highly relevant." (citations omitted)).

The court finds that Solomon has not met his burden of demonstrating how the Roviaro balancing test supports his request. Therefore, the court, in its discretion, will deny his motion to compel disclosure at this time.[11]

## III. CONCLUSION

Having carefully considered all arguments by the parties and for the reasons set forth above,

IT IS THEREFORE ORDERED as follows:

(1) Defendant Dwight Leander Solomon's Motion to Suppress (Doc. 13) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to the two invoices and the rebate coupon seized from 418 Maple Avenue. The motion is DENIED in all other respects.[12]

---

[11] This ruling is without prejudice to Solomon's ability to renew the motion should additional facts be presented at trial warranting disclosure.

[12] To the extent Solomon's "Motion to Suppress and Request for a Franks Hearing" (Doc. 24) presents arguments in favor of suppression, those arguments have been fully dealt with in this Memorandum Opinion and are disposed of by this Order.

(2) Defendant Dwight Leander Solomon's Motion to Compel Disclosure of Identity of Confidential Informant (Doc. 20) is DENIED.

/s/ Thomas D. Schroeder
United States District Judge

May 4, 2011